## HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* MOUNTAIN PRODUCERS CORPORATION.

No. 600. Argued February 10, 1938.—Decided March 7, 1938.

*Assistant Solicitor General Bell,* with whom *Solicitor General Reed, Assistant Attorney General Morris,* and Messrs. *Sewall Key, Maurice J. Mahoney, Warner W. Gardner,* and *Edward J. Ennis* were on the brief, for petitioner.

*Mr. Harold D. Roberts,* with whom *Mr. Randolph E. Paul* was on the brief, for respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Respondent, Mountain Producers Corporation, owned all the capital stock of the Wyoming Associated Oil Corporation and filed a consolidated income tax return for the year 1925. Two distinct questions are involved with respect to the taxable income of the above-mentioned affiliate. These are (1) as to the amount of the gross income of the affiliate for the purpose of the statutory allowance for depletion in the case of oil and gas wells (Revenue Act of 1926, § 204 (c) (2), § 234 (a) (8)); and (2) as to a claim of exemption from taxation of income received by the affiliate under a trust agreement with the owner of an oil and gas lease from the State of Wyoming. The Board of Tax Appeals decided against respondent upon both points (34 B. T. A. 409) and its decision was reversed by the Circuit Court of Appeals. 92 F. (2d) 78. Because of an asserted conflict with a decision of the Circuit Court of Appeals for the Ninth Circuit in the case of *Bankline Oil Co.* v. *Commissioner,* 90 F. (2d) 899, (see *Helvering* v. *Bankline Oil Co., ante,* p. 362), we granted certiorari.

*First.*—Wyoming Associated, organized in 1919, held certain placer mining claims, leases and operating agreements in the Salt Creek Oil Field in Natrona County, Wyoming. Pursuant to the Oil and Gas Leasing Act of Congress of February 25, 1920, the company exchanged its placer claims for government leases, and later certain

exchanges were made with the Midwest Oil Company and the Wyoming Oil Fields Company. In 1923, Wyoming Associated made a contract with the Midwest Refining Company by which the former agreed to sell to the latter all the oil produced by it in the Salt Creek Oil Field and the Refining Company agreed to purchase such oil until January, 1934, upon a sliding scale of prices based upon the average price received by the Refining Company for gasoline and kerosene. Wyoming Associated agreed to give the Refining Company free use of all storage facilities, pipe lines, buildings and equipment, and so much of the oil and gas produced as might be reasonably necessary for production purposes. The Refining Company agreed, as part of the price of the oil thus purchased, to drill, case and maintain all wells, supply water, install and operate pumps, and conduct all development and production operations. The Refining Company agreed to take delivery of the purchased oil at the outlet gates of the measuring tanks located at or near the wells.

Respondent contended that the gross income of Wyoming Associated from its properties during the taxable year, for the purpose of the statutory allowance for depletion, consisted of the total cash payments received by Wyoming Associated, plus the cost of production defrayed by the Refining Company under its contract. The amount of that cost was shown by stipulation. The Board of Tax Appeals limited the gross income of Wyoming Associated to the cash payments received. The Circuit Court of Appeals was of the opinion that the cost of production incurred by the Refining Company should be added in the view that, had Wyoming Associated produced the oil at its own expense, its gross income would have been the amount which it received for the oil sold and it would thus have obtained in cash the proportionate amount which represented the cost of the production.

Laying emphasis upon the provision of the contract that the Refining Company should perform its services as a part of the purchase price of the oil, respondent contends that it is irrelevant that the Refining Company acted for its own benefit; that the production and lifting services were performed prior to delivery of the oil, and that the Refining Company was acting as the agent for Wyoming Associated down to the point of delivery and not until then became a vendee; that thus Wyoming Associated did not sell oil under the ground but oil severed from the ground and treated for delivery; that it was not essential for respondent to show that the total price under the contract must be either above or below the market price at any specified time, and that the price as fixed by the contract controlled the dealings and the taxes of the parties. Respondent agrees that an interest in oil or gas or some type of ownership is essential to the right of deduction for depletion and assumes that no one but Wyoming Associated owned any interest in the oil and gas in place.

The Government argues that the cash price received for the oil is the seller's entire "gross income from the property" where, as in this instance, the oil is purchased under a contract by which a refiner agrees to defray the expense of the development and production operations and to pay a cash price based on the prices it obtains for the products it sells at its refinery; that the oil production operations were conducted by the Refining Company for its own benefit in order to obtain the oil at a price it deemed to be favorable; that the method of determining the purchase price under the contract was not related to the field market price of oil but was expressly related to a different basis, which might be greater, that is, to a basis consisting of the current prices obtained by the Refining Company for its gasoline and kerosene; that if the development operations had been unsuccess-

ful and no oil had been produced, the services of the Refining Company would still have been paid for by the owner's promise to sell at a fixed price whatever oil might be produced, and that this should be taken to be the meaning of the provision that the Refining Company should perform its services as part of the price for oil purchased; that the owner of oil in place, instead of preparing it for delivery and sale, may prefer to lessen his work, lower his price and thus decrease his gross income from the property, and in such case the services which the buyer may perform are not to be regarded as part of that income.

We think that the Government's argument is sound. The evident purpose of the statutory provision controls. It is a unique provision to meet a special case. Analogies sought to be drawn from other applications of the revenue acts may be delusive and lead us far from the intent of Congress in this instance. Congress has recognized that in fairness there should be compensation to the owner for the exhaustion of the mineral deposits in the course of production. *United States* v. *Ludey*, 274 U. S. 295, 302. But to appraise the actual extent of depletion on the particular facts in relation to each taxpayer would give rise to problems of considerable perplexity and would create administrative difficulties which it was intended to overcome by laying down a simple rule which could be easily applied. To this end, the taxpayer was permitted to deduct a specified percentage of his gross income from the property. See *United States* v. *Dakota-Montana Oil Co.*, 288 U. S. 459, 461. Congress was free to give such an arbitrary allowance as the deduction was an act of grace. In answer to the contention that the provision may produce "unjust and unequal results," we have remarked that this is likely to be so "wherever a rule of thumb is applied without a detailed examination of the facts affecting each taxpayer." *Helvering* v. *Twin Bell Syndicate*, 293 U. S. 312, 321.

The rule being of this sort for obvious purposes of administrative convenience, we must apply it in the simple manner it contemplates. The 27½ per cent. allowed is a fixed factor, not to be increased or lessened by asserted equities. The term "gross income from the property" means gross income from the oil and gas (*Helvering* v. *Twin Bell Syndicate, supra*) and the term should be taken in its natural sense. With the motives which lead the taxpayer to be satisfied with the proceeds he receives we are not concerned. If, in this instance, the development operations had failed to produce oil, it would hardly be said that the expense of drilling, borne under contract by another, constituted "gross income" of the taxpayer within the meaning of the statute. Nor, when oil or gas is produced, does the statute base the percentage on market value. The gross income from time to time may be more or less than market value according to the bearing of particular contracts. We do not think that we are at liberty to construct a theoretical gross income by recourse to the expenses of production operations. The Refining Company for its own purposes undertook the expense of those operations, and Wyoming Associated was content to receive as its own return the cash payments for the oil produced, leaving to the Refining Company the risks of production.

We are of the opinion that, the cash payments made by the Refining Company constituted the gross income of Wyoming Associated and were the basis for the computation of the depletion allowance.

*Second.*—The State of Wyoming, in 1919, made a lease for the term of five years to the Midwest Oil Company covering a section of "school land" (section 36, township 40 north, range 79 west) for the purpose of producing oil and gas, reserving a royalty to the State. The lease was superseded in 1923 by another lease of like import, running from 1924, the royalty to the State being fixed at 65 per cent. of oil and gas produced. In

1923, the Midwest Oil Company executed a declaration of trust, that it held an undivided 50 per cent. interest in the lease, and in the net proceeds to be realized therefrom, and all renewals thereof, for the benefit of Wyoming Associated. In 1925, the State received the agreed royalty of the oil produced and the proceeds of the sale of the remaining oil were divided between Wyoming Associated and the Midwest Oil Company.

The question is whether Wyoming Associated is subject to a federal income tax with respect to the amount it thus received. Immunity is claimed upon the ground that in this relation Wyoming Associated is a state instrumentality.

By the Enabling Act, the land in question was granted to the State of Wyoming for educational purposes, the proceeds to constitute a permanent school fund. Authority was given to lease such land for not more than five years. Act of July 10, 1890, c. 664, §§ 4, 5, 26 Stat. 222, 223. Apart from the fact that the claim is made by Wyoming Associated by virtue of the declaration of trust, and not by the lessee, the case would fall directly within the decision in Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, relating to a federal tax upon net income derived by a lessee under a lease of "school lands" by the State of Oklahoma. In Burnet v. Jergins Trust, 288 U. S. 508, we limited the application of the Coronado case, saying that the doctrine invoked was to be applied strictly. But a distinction solely upon the ground that the income in the instant case was received under a declaration of trust by the lessee, and not by the lessee itself, does not appear to be substantial and we are of the opinion that the Coronado case and the decision upon which it rested should be reconsidered in the light of our other decisions as to the taxing power.

The Coronado case was decided as a corollary to the case of Gillespie v. Oklahoma, 257 U. S. 501. The Court there denied to Oklahoma the right to enforce its tax

upon net income derived by a lessee from sales of his share of oil and gas received under leases of restricted Indian lands. See *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. 522. As Oklahoma was thus barred from enforcing its tax upon the income of a federal lessee of Indian lands, the Court in the *Coronado* case held that a similar principle should be applied to the enforcement of a federal tax upon the income of the State's lessee of school lands. In such a case, as the State was executing a trust imposed by Congress as a condition of the State's entering the Union, the cases in which the State had engaged in business enterprises, apart from what should be deemed to be its essential governmental functions, were thought to be inapplicable. 285 U. S. p. 400.

The ground of the decision in the *Gillespie* case, as stated by Mr. Justice Holmes in speaking for the Court, was that, "a tax upon the leases" was "a tax upon the power to make them, and could be used to destroy the power to make them" (240 U. S. p. 530) and that a tax "upon the profits of the leases" was "a direct hamper upon the effort of the United States to make the best terms that it can for its wards." In the light of the expanding needs of State and Nation, the inquiry has been pressed whether this conclusion has adequate basis; whether in a case where the tax is not laid upon the leases as such, or upon the government's property or interest, but is imposed upon the gains of the lessee, like that laid upon others engaged in similar business enterprises, there is in truth such a direct and substantial interference with the performance of the government's obligation as to require immunity for the lessee's income. We have held that the ruling in the *Gillespie* case should be limited strictly to cases closely analogous (*Burnet* v. *Coronado Oil & Gas Co., supra*), and the distinctions

thus maintained have attenuated its teaching and raised grave doubt as to whether it should longer be supported.

In numerous decisions we have had occasion to declare the competing principle, buttressed by the most cogent considerations, that the power to tax should not be crippled "by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality and there is only remote, if any, influence upon the exercise of the functions of government." *Willcuts* v. *Bunn*, 282 U. S. 216, 225, and illustrations there cited. Thus we have held that the compensation paid by a State or a municipality to a consulting engineer for work on public projects may be subjected to a federal income tax (*Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 524) and that the income of independent contractors engaged in carrying on government enterprises may be taxed. *James* v. *Dravo Contracting Co.*, 302 U. S. 134. We have always recognized that no constitutional implications prohibit a non-discriminatory tax upon the property of an agent of government merely because it is the property of such an agent and used in the conduct of the agent's operations and necessary for the agency. *McCulloch* v. *Maryland*, 4 Wheat. 316, 436; *Railroad Company* v. *Peniston*, 18 Wall. 5, 33; *Alward* v. *Johnson*, 282 U. S. 509, 514. The Congress may tax state banks upon the average amount of their deposits, although deposits of state funds by state officers are included. *Manhattan Company* v. *Blake*, 148 U. S. 412. Both the Congress and the States have the power to tax transfers or successions in case of death, and this power extends to the taxation by a State of bequests to the United States and to the taxation by the Congress of bequests to States or their municipalities. *United States* v. *Perkins*, 163 U. S. 625; *Snyder* v. *Bettman*, 190 U. S. 249, 253, 254.

While a tax on the interest payable on state and municipal bonds has been held to be invalid as a tax bearing directly upon the exercise of the borrowing power of the Government (*Weston* v. *Charleston,* 2 Pet. 449, 468, 469; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 586), the sale of the bonds by their owners after they have been issued by the State or municipality is regarded as a transaction distinct from the contracts made by the government in the bonds themselves, and the profits of such sales are subject to the federal income tax. *Willcuts* v. *Bunn, supra,* p. 227. See, also, *Burnet* v. *Jergins Trust, supra; Helvering* v. *Therrell, ante,* p. 218; and *Helvering* v. *Bankline Oil Co., ante,* p. 362.

In *Group No. 1 Oil Corporation* v. *Bass,* 283 U. S. 279, profits derived by a lessee from the sale of oil and gas produced under a lease from the State of Texas were held not to be immune from federal taxation. This decision was distinguished in the *Coronado* case upon the narrow ground that under the law of Texas the leases effected a present sale to the lessee of the oil and gas in place. In *Indian Territory Oil Co.* v. *Board of Equalization,* 288 U. S. 325, the Court sustained a non-discriminatory *ad valorem* tax imposed by the State of Oklahoma on oil extracted from restricted Indian lands under leases approved by the Secretary of the Interior, where the oil had been removed from the lands and stored in the owner's tanks and the Indians had no further interest in it.

These decisions in a variety of applications enforce what we deem to be the controlling view—that immunity from non-discriminatory taxation sought by a private person for his property or gains because he is engaged in operations under a government contract or lease cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects. And where

it merely appears that one operating under a government contract or lease is subjected to a tax with respect to his profits on the same basis as others who are engaged in similar businesses, there is no sufficient ground for holding that the effect upon the Government is other than indirect and remote. We are convinced that the rulings in *Gillespie* v. *Oklahoma, supra,* and *Burnet* v. *Coronado Oil & Gas Co., supra,* are out of harmony with correct principle and accordingly they should be, and they now are, overruled.

In the instant case, we find no ground for concluding that the tax upon the profits of Wyoming Associated derived under its lease from the State constituted any direct and substantial interference with the execution of the trust which the State has assumed, and the decision of the Circuit Court of Appeals to the contrary must be reversed.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration and decision of this case.

MR. JUSTICE BUTLER, dissenting.

At least since *M'Culloch* v. *Maryland* (1819), 4 Wheat. 316, the dual form of government resulting from the adoption of the Constitution has been deemed necessarily to imply that no State may tax the operations of the Federal Government in the exertion of powers that the people delegated to it and that, for the same reason, the Federal Government may not tax the operations of any State in the exertion of any of its essential functions of government. As to that principle, the urgency of governmental demand for money does not justify yielding here. No one can foresee the extent to which the decision just announced surrenders it. The transactions of a State

for the purpose of raising money to provide for schools are admittedly within the principle as heretofore it has been understood and applied. Now this Court makes it lawful for the United States to lay tribute upon them.

A few citations will be sufficient to suggest the character of the change so wrought.

*M'Culloch* v. *Maryland* held that impliedly the Federal Constitution forbade imposition by Maryland of any tax upon the operations of the Bank of the United States within that State. There Chief Justice Marshall, speaking for a unanimous Court, demonstrates (p. 426): "1st. That a power to create implies a power to preserve. 2nd. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve. 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme."

*Farmers & Mechanics Bank* v. *Minnesota* (1914), 232 U. S. 516, held that a State cannot tax bonds issued by a territory of the United States; that a tax upon the bonds is a tax on the government issuing them; that such a tax, if allowed at all, may be carried to an extent that will entirely arrest governmental operations. The Court rested that decision upon *M'Culloch* v. *Maryland,* saying (p. 521): "The principle has never since been departed from, and has often been reasserted and applied." [1]

*Choctaw, O. & G. R. Co.* v. *Harrison* (1914), 235 U. S. 292, held that, where by agreement with an Indian tribe the United States assumed a duty in regard to operation of coal mines, the lessees of the mines were instrumentalities of the government and could not be subjected to a state occupation or privilege tax. [2]

---

[1] Citing *Osborn* v. *U. S. Bank,* 9 Wheat. 738, 859; *Home Savings Bank* v. *Des Moines,* 205 U. S. 503, 513; *Grether* v. *Wright,* 75 Fed. 742, 753.

[2] Citing *M'Culloch* v. *Maryland,* 4 Wheat. 316; *Farmers & Mechanics Bank* v. *Minnesota,* 232 U. S. 516.

*Indian Territory Oil Co.* v. *Oklahoma* (1916), 240 U. S. 522, held that oil leases in Oklahoma made by the Osage tribe were under the protection of the Federal Government; that the corporation owning the leases was a federal instrumentality and that therefore the State could not tax its interest in the leases, either directly or by taxing the capital stock of the corporation owning them.[3]

*Gillespie* v. *Oklahoma* (1922), 257 U. S. 501, held that net income derived from leases like those considered in *Choctaw, O. & G. R. Co.* v. *Harrison, supra,* and *Indian Territory Oil Co.* v. *Oklahoma, supra,* could not be taxed by the State; for the lessee was an instrumentality used by the United States in fulfilling its duties to the Indians.[4] The Court said (p. 506): "The same considerations that invalidate a tax upon the leases invalidate a tax upon the profits of the leases, and, stopping short of theoretical possibilities, a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms that it can for its wards."

---

[3] Citing *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292.

[4] Citing *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Indian Territory Oil Co.* v. *Oklahoma,* 240 U. S. 522; *Howard* v. *Gipsy Oil Co.,* 247 U. S. 503; *Large Oil Co.* v. *Howard,* 248 U. S. 549.

As to taxability of gains from interstate commerce, see *U. S. Glue Co.* v. *Oak Creek,* 247 U. S. 321; *Shaffer* v. *Carter,* 252 U. S. 37, 57.

In *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 399, 400, it is stated that *Gillespie* v. *Oklahoma* has often been referred to as the expression of an accepted principle, citing *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 522; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609, 613; *Northwestern Mutual Ins. Co.* v. *Wisconsin,* 275 U. S. 136, 140; *Heiner* v. *Colonial Trust Co.,* 275 U. S. 232, 234; *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575, 579; *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, 221, 222; *Carpenter* v. *Shaw,* 280 U. S. 363, 366; *Willcuts* v. *Bunn,* 282 U. S. 216, 229; *Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279, 282, 283; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 576; *Choteau* v. *Burnet,* 283 U. S. 691, 696.

*Jaybird Mining Co.* v. *Weir* (1926), 271 U. S. 609, held that where mining land was leased by incompetent Indian owners with the approval of the Secretary of the Interior, in consideration of royalty in kind, a state *ad valorem* tax assessed to lessee on ores in bins on the land, before sale or segregation, was void as an attempt to tax an agency of the Federal Government.[5]

In *Burnet* v. *Coronado Oil & Gas Co.* (1932), 285 U. S. 393, it appeared that lands granted by the United States to Oklahoma for the support of common schools were leased by the State to a private company for extraction of oil and gas, the State reserving a part of the gross production, the proceeds of which were paid into the school fund. We held that the lease was an instrumentality of the State in the exercise of a strictly governmental function, and that application of the federal income tax to the income derived from the lease by the lessee was therefore unconstitutional.[6]

To reach in this case the conclusion that respondent's affiliate is subject to federal income tax on the proceeds of its share of the oil received under the lease of state school lands, this Court expressly overrules *Gillespie* v. *Oklahoma, supra,* and *Burnet* v. *Coronado Oil & Gas Co., supra;* and with them necessarily goes a long line of decisions of this and other courts. The opinion brings forward no real reason for so sweeping a change of con-

---

[5] Citing *Farmers & Mechanics Bank* v. *Minnesota,* 232 U. S. 516; *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Indian Territory Oil Co.* v. *Oklahoma,* 240 U. S. 522; *Gillespie* v. *Oklahoma,* 257 U. S. 501; *Howard* v. *Gipsy Oil Co.,* 247 U. S. 503; *Large Oil Co.* v. *Howard,* 248 U. S. 549.

[6] Following *Gillespie* v. *Oklahoma,* 257 U. S. 501. Citing *Texas* v. *White,* 7 Wall. 700, 725; *Collector* v. *Day,* 11 Wall. 113; *Pollock* v. *Farmers Loan & Trust Co.,* 157 U. S. 429, 584; *Farmers & Mechanics Bank* v. *Minnesota,* 232 U. S. 516, 527.

struction of the Constitution. It is to the plain disad-
vantage of Indian wards of the National Government and
school children of the several States; it threatens many
business arrangements that have been made for their
benefit.

I dissent.

MR. JUSTICE MCREYNOLDS concurs in this opinion.