## Commonwealth v. Guseman

*Joseph W. Ray, Jr.*, for Public Utility Commission.

*J. K. Spurgeon, Wade K. Newell,* and *J. C. Glassburn,* for defendant.

CARR, J., June 2, 1939.—Defendant owned and operated a dump truck in Works Progress Administration work under a contract with the United States Treasury Department, and was summarily convicted before an alderman of engaging in the business of a contract carrier by motor vehicle without a permit from the Public Utility Commission authorizing him to engage in such business, contrary to section 804(a) of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1101, et seq.

The facts of the case are not disputed, but on this appeal defendant contends: (1) That his single contract for a limited period does not constitute engaging in the business of a contract carrier; (2) that the Commonwealth has no constitutional authority to regulate the business of contract carriers; and (3) that the requirements of the law as extended to his contract are an unconstitutional interference by the State with the performance of an essential function of the Federal Government.

At the time of his arrest on April 3, 1939, defendant had been operating his truck upon the public highway, hauling stone from a quarry to an Army airport being constructed by the Works Progress Administration upon land leased to the Federal Government. The project was one authorized by the Federal Emergency Relief Appropriation Act of June 21, 1938, 52 Stat. at L. 809. On January 14, 1939, the State Procurement Office of the United States Treasury Department issued invitations for bids for the rental of dump trucks with operator, including all necessary fuel, oil, maintenance, and repairs for such service, within Fayette County, as should be required from March 26, 1939, up to but not later than September 25, 1939. Payment was to be made for such time only as the equipment was used on a project, as directed by an authorized project official, but was not to include time required to move it to and from the job site. Contractors were required to comply with the regulations of the Public Utility Commission of the Com-

monwealth of Pennsylvania, but on January 27, 1939, this requirement was withdrawn. On January 17, 1939, defendant submitted his bid for his truck, with operator, at an hourly rate of $1.98. On March 17, 1939, his bid was accepted and he was assigned to the airport, beginning on March 27, 1939. There, and upon the highways in that vicinity, at least until the day of his trial, he operated his truck in transporting stone and other materials required in the construction of the runways, driving it home each night and returning with it each morning. The truck was previously used in hauling coal in connection with the business of a small custom mine in which he had an interest, although on a few other occasions when it was not needed at the mine he had transported materials in it for the Works Progress Administration.

Section 2(7) of the Public Utility Law, supra, defines "Contract Carrier by Motor Vehicle" to mean "any person or corporation who or which provides or furnishes transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes, with or without drivers, any motor vehicle for such transportation, or for use in such transportation, other than as a common carrier by motor vehicle . . .".

The prohibition of section 804(a) of the act is directed against all persons who "engage in the business of a contract carrier by motor vehicle unless there is in force with respect to such carrier a permit issued by the commission . . .".

There can be no doubt that defendant was acting as a contract carrier as defined by the act, but it is argued that his contract for the use of his truck at a time when it was not needed in his usual occupation was only a single or casual transaction that cannot constitute "engaging in business" within the accepted meaning of those words,

and therefore was not a violation of the law. It is true that one cannot be said to be engaged in a business unless there is, to some extent, a continuous occupation: Fleckenstein Brothers' Co. v. Fleckenstein et al., 66 N. J. Eq. 252, 57 Atl. 1025, but the extent of continuity implied in the words "engaged in business" depends upon the thing that engages. While the doing of a single act pertaining to a particular business may not properly be considered as engaging in or carrying on a business, a series of such acts clearly must be so considered: Harris v. The State, 50 Ala. 127, 130. The device of a single contract cannot conceal the carrier's status: Klawansky v. Public Service Comm., 123 Pa. Superior Ct. 375. Defendant contracted to furnish his truck, with driver, for as many days as it should be required during a continuous period of six months. His engagement was not a casual one, but constant and regular, day by day. For the full contract period the truck was necessarily withdrawn from all other service. These facts are, in our opinion, sufficient to establish a violation of the prohibition against engaging in business as a contract carrier by motor vehicle.

The right of the Commonwealth to regulate the business of contract carriers is rested upon the following declaration, contained in section 801 of the Public Utility Law: "It is hereby declared to be the policy of the Legislature . . . to develop and preserve a safe highway transportation system properly adapted to the needs of the commerce of the Commonwealth of Pennsylvania and insure its availability between all points of production and markets of this Commonwealth. It is hereby found as a fact, after due investigation and deliberation, that the service of common carriers by motor vehicle, forwarders, contract carriers by motor vehicle, and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, are so closely

interwoven and interdependent, and so directly affect each other, that in order effectively to regulate such common carriers by motor vehicle and forwarders, and to provide a proper and safe highway transportation system in the public interest, it is necessary to regulate the service of such contract carriers by motor vehicle and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, in the manner set forth in this article."

Thus, in support of the validity of the regulation of contract carriers, two purposes are declared: First, the effective regulation of common carriers; and second, the provision and preservation of a proper and safe highway transportation system.

The regulation of common carriers is viewed by the legislature as a necessary part of the whole scheme of carrier regulation, and as a necessary means of developing and preserving the highway system and safeguarding all commercial transportation thereon. Certainly the ends sought are legitimate subjects for the exercise of the State legislative power. The extent to which the means chosen conduce to these ends, the degree of their efficiency, the closeness of their relation to the ends sought to be attained, are matters addressed to the judgment of the legislature, and not to that of the courts. It is enough if it can be seen that, in any degree or under any reasonably conceivable circumstances, there is an actual relation between the means and the end: Stephenson et al. v. Binford et al., 287 U. S. 251, 77 L. Ed. 288.

The contract carrier does not, as the common carrier must, hold himself out to serve the public indiscriminately in whatever field of transportation he operates, but transports only for those whom he chooses, making contracts, as in any other business, for an individual transaction or group of transactions. Many have a

regular line of customers whom they serve with general or special equipment. Others have a limited clientele, and specialize in certain types of traffic. At least in some fields, they have become formidable and often successful rivals of the common carrier, both by rail and motor vehicle. Studies made by the Interstate Commerce Commission show that their number has grown to 85 percent of all operators, and indicate that no plan of regulation of the carrier industry is feasible that does not include the contract carrier within its provisions: Coördination of Motor Transportation, 182 I. C. C. 263. Plainly, this is a question upon which the legislature is entitled to form its own judgment: Sproles et al. v. Binford, etc., et al., 286 U. S. 374, 76 L. Ed. 1167.

In Stephenson et al. v. Binford et al., supra, the Supreme Court of the United States sustained the constitutional validity of a statute of the State of Texas regulating the business of contract carriers that was rested upon a policy of highway conservation. In view of that decision, it is not to be doubted that a State may, in the exercise of its constitutional control over the highways, regulate the business of a contract carrier if such regulation bears a conceivable relation to highway conservation: Motor Carrier Regulation Under Pennsylvania's 1937 Public Utility Law, 86 U. of P. L. R. 403, 405, 407. The declared policy of our statute differs only in words, and not in any essential substance, from that of the Texas statute. The latter employs the term "conserve", ours the terms "provide", "develop", "preserve". "Conserve" and "preserve" are synonymous words, both having as their root the Latin "servo", meaning "keep". To keep from harm, decay, or loss, is their common signification.

But the control of the State over its highways does not depend upon so narrow a conception as that of mere conservation. The highways of the State are public property. Their primary and preferred use is for private

purposes. Their use for purposes of gain is special and extraordinary, which, generally, at least, the legislature may prohibit or condition, as it sees fit: Continental Baking Co. et al. v. Woodring, etc., et al., 286 U. S. 352, 76 L. Ed. 1115; Stephenson et al. v. Binford et al., supra; annotation, 109 A. L. R. 550. The State may foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain: Sproles et al. v. Binford, etc., et al., supra. It can clearly be seen that the growing use. of trucks of all classifications, without adequate standards of safe service, is attended by increasing hazards to persons and property on and in the vicinity of the highways, and constantly necessitates extensive highway construction, maintenance, and policing. The legislative judgment that the regulation of contract carriers by motor vehicle is a fit and effective means for providing a proper and safe highway transportation system must, in these circumstances, be accepted by the courts.

For these reasons, we think that the contract carrier, whether viewed in connection with the common carrier, or in the aspect of highway control, may reasonably be declared by the legislature to require regulation. The distinctions made by the statute with respect to the special responsibilities of common carriers and the more limited but still important duties that are owing as well by contract carriers, recognize fully the constitutional rights of defendant, and there is no reason to suppose that the commission, in its administration of the law, will attempt to override them. The record raises no such question that can now be considered.

Finally, we are of opinion that defendant cannot be released from his obligation to obey the law because of his contract with a Federal agency. It is conceded, of course, that the States have no power, by taxation or

otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general Government: M'Culloch v. The State of Maryland et al., 4 Wheat. (17 U. S.) 316. On the other hand, such immunity sought by a private person for his property, because it is engaged in operations under a Government contract, cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects: Helvering, etc., v. Mountain Producers Corp., 303 U. S. 376, 82 L. Ed. 907; James, etc., v. Dravo Contracting Co., 302 U. S. 134, 82 L. Ed. 155. An agency of the Federal Government within a State cannot escape every consequence of its location within a settled community, whose orderly existence is dependent upon the laws of its own local sovereignty. Although the enforcement of the law against defendant and all other contract carriers may affect the cost of transportation to the Federal agency, as well as to others, the result is, in its nature, incidental and collateral rather than immediate and direct, and not different from that of pure food laws, minimum wage and hour laws, workmen's compensation, and other social insurance laws, all of which have the effect of raising prices to everyone, including Federal agencies. The Commonwealth of Pennsylvania is merely trying to enforce upon the property of one of its own citizens a State-wide regulation enacted for the common welfare. No governmental servant, property, or instrumentality is interfered with. It is a private instrumentality, whose use of the roads for gain is to be turned to the service of the Government: Baltimore & A. R. Co. v. Lichtenberg et al. (Md. 1939), 4 A. (2) 734. No burden is laid upon the contract itself, and the impediment of the contractor affects the operation of the Federal Government only remotely.

These conclusions require us to find defendant guilty of a violation of section 804 (*a*) of the Public Utility Law.

*Order*

And now, June 2, 1939, the court finds defendant guilty of engaging in the business of a contract carrier by motor vehicle without a permit from the Public Utility Commission authorizing him to engage in such business.