JAMES P. EVANS, SR., PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16527, 16528, 16529, 16530, 16531.  Promulgated October 29, 1948.

*George S. Atkinson, Esq., Tom B. Rhodes, Jr., Esq.*, and *C. L. Brooke, C. P. A.*, for the petitioners.
*John W. Alexander, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Edith S. Evans; William S. Evans; Catherine M. Evans; and James P. Evans, Jr.

728

OPINION.

OPPER, *Judge*: In computing their deduction for percentage depletion of their oil lease petitioners seek to have included in the "gross income from the property"[3] for the fiscal year ending June 30, 1943, the amount which the purchaser of its oil, which was owner and operator of the pipe line servicing petitioners' lease, deducted from an agreed price, as a "gathering" and "freight equalization charge," pursuant to their written contract.

The issue seems to us to be settled by respondent's regulation, which petitioners do not question and which has been in effect without material alteration during successive reenactments of the revenue acts. *United States* v. *Dakota-Montana Oil Co.*, 288 U. S. 459. That regulation employs as a definition of "gross income from the property"[4] the principle that the crude product itself at the source is determina-

---

[3] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

　*　　　*　　　*　　　*　　　*　　　*　　　*

(b) BASIS FOR DEPLETION.—

　*　　　*　　　*　　　*　　　*　　　*　　　*

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.　*　　*　　*

[4] In the form effective prior to October, 1944, the text was as follows:

"(f) 'Gross income from the property,' as used in section 114 (b) (3) and (4) and sections 29.23 (m)–1 to 29.23 (m)–28, inclusive, means the amount for which the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine or well, but, if the product is transported or processed (other than by the processes excepted below) before sale, it means the representative market or field price (as of the date of sale) or crude mineral product of like kind and grade before such transportation or processing. If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation and the processes not listed below.　*　　*　　*

"In the case of oil and gas, if the crude mineral product is not sold on the property but is manufactured or converted into a refined product or is transported from the property prior to the sale, then the 'gross income from the property' shall be assumed to be equivalent

tive, see *Helvering* v. *Twin-Bell Oil Syndicate*, 293 U. S. 312, and that if other items are included in the ultimate sale, such as refining, processing, or transportation, they are to be eliminated as nearly as may be in arriving at the figure sought. *Consumers Natural Gas Co.*, 30 B. T. A. 1263; affd. (C. C. A., 2d Cir.), 78 Fed. (2d) 161; certiorari denied, 296 U. S. 634.

Here the facts do not require us to separate such nonrelated items, since the arm's length agreement of the parties makes it clear that they considered [5] the net amount paid to petitioners was the price for which the crude product was purchased "in the immediate vicinity of the well," and that the balance, whether handled by deduction from the gross amount or by repayment to the purchasers, would be chargeable to transportation and not to the oil itself. The amount of depletion allowable to producers may vary with their individual situations, depending as it does on what they can command at the well for their product in its crude state. *Helvering* v. *Mountain Producers Corporation*, 303 U. S. 376.

It follows not only that the amount employed by the respondent to compute petitioners' percentage depletion is correct, but that no inequity or lack of realism results, since it is that unexpanded figure, not related to transportation or other subsequent costs, which the statute, as construed by the regulation, would seek in the case of any oil producer. What petitioners paid for indirectly through the deductions from the gross price was, as we have said, the cost of transportation of the oil after it had been produced. The deductions did not cover costs of producing the crude product itself, for which an allowance might have to be added back—if paid directly, or through an agent as in *Oliver Iron Mining Co.*, 10 T. C. 908—before the "gross income" from the oil itself could be found. But cf. *Helvering* v. *Mountain Producers Corporation*, *supra*. Even if the title to the oil had passed at the end of the transportation process instead of the beginning, and even if the agreement and the practice of the parties had been to pay the larger amount to petitioners and require a counterpayment by them, the consequence would thus be the same, and a deficiency similarly determined would have to be sustained there, as it must be here. *Consumers Natural Gas Co.* v. *Commissioner*, *supra*.

*Decisions will be entered for the respondent.*

---

to the market or field price of the oil or gas before conversion or transportation." (Regulations 111, sec. 29.23 (m)-1(*f*).)

[5] "* * * My deal with him [the purchaser] was to sell oil at my tanks on my lease.

\* \* \* \* \* \* \*

"* * * I think the six cents was what he [the purchaser] considered the cost of taking the oil from the lease to the loading rack and the balance of it from the loading rack to the refinery."