**ZONOLITE CO.**
v.
**UNITED STATES.**
No. 10980.

United States Court of Appeals
Seventh Circuit.
March 25, 1954.

H. Brian Holland, Asst. Atty. Gen., Carolyn R. Just, Atty., U. S. Dept. of Justice, Washington, D. C., Robert Tieken, U. S. Atty., Chicago, Ill., Otto Kerner, Jr., U. S. Atty., John A. Looby, Jr., Asst. U. S. Atty., Chicago, Ill., Ellis N. Slack, Joseph F. Goetten, Sp. Assts. to Atty. Gen., for appellant.

John H. Bishop, William M. Doherty, Chicago, Ill., for appellee.

Before DUFFY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This is an appeal from a judgment of the District Court granting a refund to plaintiff on account of an asserted overpayment of corporate income tax for the fiscal year ended March 31, 1945.

The material facts are as follows:

Plaintiff is a Montana corporation with its principal office in Chicago, Illinois. During the period in question it was engaged in the mining of a non-metallic mineral called vermiculite from a mine approximately seven miles northeast of Libby, Montana. The crude mineral was removed from an open-pit mine and transported by tractors to a cleaning and concentrating plant approximately one-half mile from the pit. At the plant the crude mineral was put through a process consisting essentially of crushing, drying and screening. The concentrate so produced was transported by tramway to ore bins, from which it was loaded into trucks and hauled to the nearest railroad at Libby, Montana. The concentrate was there loaded into railroad cars for shipment to the taxpayer's customers. Concentrate not loaded directly into railroad cars was placed in storage bins at the railroad siding at Libby until such time as it was required to fill orders from customers. The major part of the vermiculite concentrate which was shipped from Libby, Montana, was sold by the taxpayer to processors located at various points in the United States. These processors have plants in which they treat the concentrate by subjecting it to a high degree of heat. When the concentrate is processed, it expands, the volume of the expanded product being about fifteen times greater than the volume of the concentrate. The expanded product is used for insulation, plaster and concrete aggregate, high temperature cements, fertilizer conditioner, and other similar purposes.

The vermiculite concentrates were sold f. o. b. cars at Libby, Montana. The average selling price for the different grades of concentrates was $10.70 per ton. During the fiscal year in question the taxpayer mined and transported to the railroad at Libby 64,901 tons of concentrates. It paid a private hauling contractor 70¢ per ton to truck the concentrates from the ore bins at the mine to the railroad, the total payment amounting to $45,430.86. Approximately four of the seven miles from the taxpayer's mine to Libby are covered by a state highway; the remaining three miles are covered by a road which is maintained by the taxpayer and about one-third of which is over property owned by the taxpayer. It probably would not be economically feasible for each of the taxpayer's customers to make his own arrangements to have the vermiculite concentrate hauled from the lower bin to

the town of Libby, to have freight cars there available, and to have such cars loaded and routed to their destination as needed. The vermiculite concentrate which comes from the taxpayer's milling operations is the first saleable product which results from the operation. It is sold to the taxpayer's customers in the same form in which it leaves the taxpayer's mill; any further processing by which it is made into commercial products is done after sale by the taxpayer to such customers. The taxpayer's gross sales of concentrates, taking the selling price f. o. b. Libby, Montana, amounted to $501,917.04. For that year the taxpayer computed its percentage depletion allowance at 15% of this figure. In determining an income tax deficiency, the Commissioner of Internal Revenue reduced the taxpayer's depletion allowance to 15% of $456,486.18, the figure of $501,917.04 minus the amount of $45,-430.86 which represented the cost of having the concentrates trucked from the ore bins at the mine to the railroad at Libby.

Having paid the income tax deficiency determined by the Commissioner and having had its claim for refund of that portion of the deficiency due to the reduction of its depletion allowance denied, the taxpayer brought this suit for refund in the District Court.

The United States contends that the District Court erred in holding that the taxpayer's gross income from mining, upon which the percentage deduction allowable for depletion under Sections 23 (m) and 114(b) of the Internal Revenue Code, 26 U.S.C.A. §§ 23(m), 114(b), is based, should include income received by the taxpayer for transporting its mineral product in the form in which it is sold from the mine to the place of sale.

Plaintiff contends that gross income from vermiculite mining to which percentage depletion deductions are applied means the amount received as the gross sales price of a commercially marketable mineral product that is mined, milled and delivered at a point where such product can be sold. It further contends that the depletion statutes should be applied to specific minerals in order to meet the peculiar conditions of each case; that vermiculite, a non-metallic mineral, is unusual in that the product is marketable only after it has been transported to the railroad and loaded on board railroad cars; that the gross income from mining vermiculite is the amount received from the sale of the commercially marketable mineral product resulting from the application of the ordinary treatment processes, *i. e.*, the sales price f. o. b. cars at the railroad; that such transportation as is necessary to produce the commercially marketable mineral product including trucking from the mine to the railroad, is part of the treatment process and is therefore not to be excluded from the gross income in computing the amount to which the percentage depletion deduction is to be applied.

Certain sections of the Internal Revenue Code, 26 U.S.C.A., must be considered. Section 23(m) provides:

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(m) *Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary."

Section 114(b) (4) (A) and (B) read as follows:

"§ 114. Basis for depreciation and depletion

\* \* \* \* \* \*

(b) Basis for depletion

\* \* \* \* \* \*

"(4) (A) *In general.* The allowance for depletion under section 23 (m) shall be \* \* \* in the case of \* \* \* vermiculite \* \* \* mines \* \* \* 15 per centum \* \*

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *

"(B) *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * * (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores."

Pertinent Treasury Regulations, promulgated under the Internal Revenue Code, and in effect at the time involved herein, are parts of Section 29, 26 Code of Federal Regulations, as follows:

"Sec. 29.23(m)–1. *Depletion of mines, oil and gas wells, other natu-* ral deposits, and timber; depreciation of improvements.—Section 23 (m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

\*   \*   \*   \*   \*   \*

"(f) [as amended by T.D. 5413, 1944 Cum.Bull. 124] The term 'gross income from property,' as used in sections 114(b)(3) and 114 (b)(4)(A) and sections 29.23(m)–1 to 29.23(m)–28, inclusive, means the following:

\*   \*   \*   \*   \*   \*

"In the case of a crude mineral product other than oil and gas, 'gross income from the property,' as used in section 114(b)(4)(A) means the gross income from mining. The term 'mining' as used herein includes not only the extraction of ores or minerals from the ground but also the ordinary treatment processes which are normally applied by the mine owners or operators to the crude mineral product after extraction in order to obtain the commercially marketable mineral product or products.

"If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product. If there is no

such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation and the processes beyond the ordinary treatment processes.

"The term 'ordinary treatment processes' as used herein, shall include the following:

"(3) In the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of crude mineral product-sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

\* \* \* \* \* \*

"In case any of the ordinary treatment processes are not applied in the immediate vicinity of the mining district in which the mine is located, costs incurred for transportation to the processing location and, if transported by the taxpayer, the proportionate profits attributable to transportation, should be subtracted from the sale price of the product to determine 'gross income from the property.'

\* \* \* \* \* \*

"Sec. 29.23(m)–5 [as amended by T.D. 5413, supra] *Computation of depletion based on percentage of income in case of vermiculite mines,* \* \* \* Under section 114(b)(4) (A) a taxpayer may deduct for depletion \* \* \* an amount equal to 15 percent of the gross income from the property \* \* \* during any taxable year beginning after December 31, 1943 in the case of vermiculite, \* \* \* but such deduction shall not in any case exceed 50 percent of the net income of the taxpayer (computed without allow-ance for depletion) from the property. \* \* \*

"Sec. 29.114–1 [as amended by T. D. 5413, supra] *Basis for allowance of depreciation and depletion.*—The basis upon which \* \* \* depletion will be allowed in respect of any property is the same as is provided in section 113(a), adjusted as provided in section 113(b), for the purpose of determining the gain from the sale or other disposition of such property, \* \* \* except as provided \* \* \* in section 29.23 (m)–5, relating to percentage depletion \* \* \* in the case of vermiculite, \* \* \* with respect to taxable years beginning after December 31, 1943. \* \* \*"

Under the above quoted provisions of the Internal Revenue Code, supplemented by the above quoted Regulations, plaintiff was entitled to an allowance for depletion amounting to 15 percentum of the gross income from its property during the taxable year. This means the gross income from mining which includes not merely the extraction of the vermiculite from the ground but also the treatment processes which it used, but not including the cost of transportation from the concentrating plant, (about one-half mile from the open-pit mine), to Libby. The vermiculite concentrate was already a commercially marketable mineral product when it started on the seven-mile journey to Libby.

It is apparent that the concentrate when it was ready for the trip to Libby could not be sold, and that if a sale was to be made the concentrate had to be transported, as was done. Plaintiff, therefore, contends that this transportation is as much a part of the treatment process as the transportation from the mine to the mill.

Congress has recognized that in fairness there should be compensation to the owner for the exhaustion of the mineral deposits in the course of production. United States v. Ludey, 274 U.S. 295, 302, 47 S.Ct. 608, 71 L.Ed. 1054.

In Helvering v. Mountain Producers Corp., 303 U.S. 376, at page 381, 58 S. Ct. 623, at page 625, 82 L.Ed. 907, the court said:

"But to appraise the actual extent of depletion on the particular facts in relation to each taxpayer would give rise to problems of considerable perplexity and would create administrative difficulties which it was intended to overcome by laying down a simple rule which could be easily applied. To this end, the taxpayer was permitted to deduct a specified percentage of his gross income from the property. See United States v. Dakota-Montana Oil Co., 288 U.S. 459, 461, 53 S.Ct. 435, 436, 77 L.Ed. 893. Congress was free to give such an arbitrary allowance as the deduction was an act of grace. In answer to the contention that the provision may produce 'unjust and unequal results,' we have remarked that this is likely to be so 'wherever a rule of thumb is applied without a detailed examination of the facts affecting each taxpayer.' Helvering v. Twin Bell [Oil] Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383.

"The rule being of this sort for obvious purposes of administrative convenience, we must apply it in the simple manner it contemplates."

We think that the Act and the Regulations are clear. If they be illogical or unfair in their application to plaintiff's mining operation, relief is not available to plaintiff in this court, which has no legislative power. It is our duty to interpret and not change statutory law.

In Consumers Natural Gas Co. v. Commissioner of Internal Revenue, 2 Cir., 78 F.2d 161, it was held that the act fixing depreciation allowance on gas wells at a stated percentage of gross income from the property refers to income from gas at the well and not to gas at the point of sale to consumers after piping. In its reasoning the court said:

"It is quite true, as the taxpayer says, that no single formula will give a rational result for all wells. The same percentage will be too much for one deposit and too little for another; that is an inevitable consequence of abandoning any effort to learn its amount; the plan is a makeshift, at best no more than an approximation to the average of many instances. * * * But these defects are no excuse for not eliminating whatever else will impair the validity of the solution, so far as it has any validity at all."

It, therefore, follows that the District Court erred and its judgment is hereby reversed.

Reversed.